## MARFIELD *vs.* GOODHUE and others.

Where goods are sent to a factor for sale without instructions as to the time or terms of sale, he is at liberty to sell at such time and on such terms as in the exercise of a sound discretion he shall deem proper for the interest of his principal. *Per* CADY, J.

But the factor is bound to obey the subsequent instructions of his principal as to the sale, although after the receipt of the goods he has made advances thereon, unless the principal, after reasonable notice, fail to repay such advances.

Whether special circumstances, such as the insolvency of the principal or the impracticability of giving him reasonable notice to repay advances, will not justify the factor in selling contrary to his instructions, *quere.*

The plaintiff, residing in Ohio, consigned to the defendants, who were commission merchants and factors in New-York, a large quantity of pork for sale. The defendants on the receipt of the property paid the freight and charges, and subsequently they made advances thereon to the plaintiff. The plaintiff, after the advances were made, in anticipation of a rise in the market, gave the defendants instructions not to sell. *Held,* that the defendants were bound by the instructions, and had no right to sell the pork without calling on the principal to repay the advances, or giving him notice of their intention to sell.

A promise by a factor who has made advances on the goods not to sell without instructions, it seems, is upheld by a sufficient consideration.

APPEAL from the superior court of the city of New-York, where the action was case brought by Marfield against Goodhue and others for selling a quantity of pork contrary to the instructions of the plaintiff. On the trial before OAKLEY, Ch.

Marfield *v.* Goodhue.

I. in October, 1847, it appeared that during the years 1846 and 1847, the defendants were commission merchants and factors in the city of New-York, and that previous to December, 1846, the plaintiff, who resided at Chillicothe, Ohio, had from time to time consigned to them a large quantity of pork. The consignments were made without any specific instructions or limitations as to the time or terms of sale, and without any express agreement that the defendants were to make advances upon the property. On the receipt of the consignments the defendants paid the freight, and subsequently the charges for inspection, insurance, &c. They also, after the receipt of the property, made advances upon it to the plaintiff at his request.

On the 27th of November, 1846, the plaintiff wrote to the defendants saying, among other things, as follows: " As to the pork which you hold do as you think best, although I think better prices will be obtained after a while." On the 14th of December, 1846, he wrote again to the defendants, and in that letter, after stating his reasons for believing that prices would soon rise, he added, " with all these facts before me I have thought best to hold on to my pork, and I wish you to take it out of the market for the present, as I am confident that the article, if other points are short in proportion as we are, must improve much indeed." The defendants on the 21st of December, 1846, replied, acknowledging the receipt of the letter last mentioned, and stating, among other things, as follows: " It has been our intention, whenever the market discovered firmness enough to warrant our doing it, to reduce the heavy stock we hold by gradual sales, and to have sold a part of yours with other parcels. We still prefer this course, as we have held so long, but it is not probable we shall have made much progress until we can hear from you again." But, on the 28th of that month, before the defendants could have received a reply to their letter of the 21st, they sold 427 barrels of the plaintiff's pork. On the 26th of December, the plaintiff replied to the defendants' letter of the 21st, and in that reply, among other things, said: " I would rather you would hold on to my pork, as I have held so long. I would rather pay a little more inter-

est, as the appearance of things looks very fair for a considerable improvement." The receipt of that letter was acknowledged by the defendants on the 2d of January, 1847. On that day, the defendants sold 600 barrels of the plaintiff's pork, and on the 6th of that month they sold 300 barrels. On the 3d of Jan. 1847, the plaintiff wrote again to the defendants, saying, " I wish you to hold on to every barrel of my pork, as it may yet bring a price which would not result in so large a loss." On the 9th of January, 1847, the plaintiff, having received advice of the two first mentioned sales, wrote, complaining in decided terms of the violation of his orders. On the same day the defendants addressed to the plaintiff a letter acknowledging his letter of the 3d of that month, and stating as follows : " In compliance with your request, we will hold what remains of your pork for the present ; but we think it quite probable, that when you hear the state of the market here, you will conclude to avail yourself of the active demand, and continue selling gradually." Within six days afterwards, they sold 59 barrels more of the plaintiff's pork. Up to this time the defendants had not given the plaintiff any intimation that they claimed the right to sell his pork contrary to his wishes, or that they would sell unless he repaid their advances. But, in a letter of the 15th of January, 1847, they claimed a right to sell at their discretion. It was admitted that the pork was worth, on the 12th of Feb. 1847, $12½ per barrel, and that the difference between that and the prices at which the defendants had made the sales amounted on all the pork sold to $5737,68, including interest to the time of trial ; and that sum the plaintiff claimed to recover.

The chief justice charged the jury, among other things, "that the defendants were at liberty, in the exercise of a sound discretion, to sell so much of the pork as was necessary to pay their advances, and to reimburse themselves for such advances out of the proceeds of the sale, without demanding or asking repayment of them by the plaintiff, and without notifying him of their intention to sell ; that the plaintiff, after receiving such advances, had no right, by subsequent instructions, to control this right of sale, except as to the surplus not necessary for the

Marfield *v.* Goodhue.

defendants' reimbursement; and that if the jury should find that the defendants had not sold enough to pay their advances, and that the sales were made in good faith, and in the exercise of a sound discretion, the defendants were entitled to a verdict." The plaintiff excepted to so much of the charge as related to the right to sell to repay advances without demand or notice to the plaintiff, and to the want of authority on his part to control the sale after the advances had been made ; and he requested the chief justice to charge the jury, that if they believed from the evidence, that the defendants did not sell to repay themselves their advances, but in discharge of what they supposed to be the general discretion delegated to them; or if they believed from the evidence that the defendants did not put their right to sell on that ground in their correspondence with the plaintiff, then they were estopped from taking that ground now ; which charge the chief justice declined to give, and the plaintiff's counsel excepted. The counsel for the plaintiff also requested the chief justice to charge the jury, that if they believed from the evidence, that the defendants had sold any pork after the 9th day of January, 1847, when they wrote to him, "In compliance with your request we will hold on to what remains of your pork for the present," &c. the plaintiff was entitled to recover in respect of the pork so sold ; which charge the chief justice refused to give, on the ground that there did not appear to be any consideration for the agreement not to sell, nor that the plaintiff was misled by it or prevented from tendering to the defendants the residue of their advances. The plaintiff's counsel excepted. The defendants had a verdict, which the superior court refused to set aside. (*See* 1 *Sandf. Sup. Court Rep.* 360.) After judgment the plaintiff appealed to this court.

*W. C. Noyes & G. Wood,* for appellant. I. The general principle is, that the factor is bound to obey the instructions of his principal, which may be varied from time to time. And the expression of a wish or desire, in such case, amounts to instruction. (*Bell* v. *Palmer,* 6 *Cowen,* 128 ; *Story on Agency,* § 391.)

In this case the respondent received instructions to withdraw the property from the market, which he disobeyed.

II. The *general* rule also is, that advances by the factor do not deprive the principal of his power to vary the time of sale by new instructions, unless the factor give reasonable notice to the principal to repay such advances, and the principal fail to repay. (22 *Pick.* 40 ; 12 *N. Hamp. R.* 239 ; 16 *Martin's Lou. R.* 470, 4 ; 6 *M. & W.* 670 ; *Story on Agency,* § 371, 75 ; 1 *Bell's Comm.* 275, 483 ; 2 *id.* 114, 115, 116 ; *Smart* v. *Saunders,* 12 *Lond. Jur.* 751.)

III. This is a reasonable rule, because the factor is bound to consult the interest of his employer, who ought therefore, to exercise the discretion in regard to his own interest. (*Evans* v. *Potter,* 2 *Gal.* 13.) When the factor sells to repay his advances, he is consulting his own interest, which may come in conflict with the interest of his principal, of which, therefore, the latter should have notice, that by repaying he may take the control of his own *interest.* This rule is in conformity with the principle in analogous cases. The claim for advances is not due till notice to repay. (1 *Taunt. R.* 572 ; 2 *Bos. & Pul.* 667 ; 4 *Wend.* 534, 679 ; 6 *Cowen,* 181 ; 11 *Pick.* 482 ; 1 *Gal.* 360 ; 11 *Metc.* 174 ; 7 *Hill,* 497.) If he sell for the benefit of his employer, he should let the employer's instructions control. If he sell for his own benefit, viz. to repay advances, he should first notify his employer, and give him an opportunity to repay him. In all cases of liens on personal property, for a debt, whether it be a lien in the course of trade, a lien raised by equity, a pledge, or a *mortgage,* and of course accompanied with *legal ownership,* the creditor cannot sell the property without first giving reasonable notice to the debtor, so that the debtor may watch over his own interest, in a case where the interest of the party selling may come in conflict with his interest. (4 *Kent's Com.* 139, 140 ; *Tucker* v. *Wilson,* 1 *P. Wms.* 261 ; 1 *Brown's P. C.* 494, *S. C.* ; 2 *Atkins,* 303 ; 2 *John. Ca.* 100 ; *Cowp.* 251, 256.) Therefore, the court erred in supposing, because the interest of the factor advancing, was in the nature of

Marfield v. Goodhue.

a mortgage, or *special ownership*, notice might be dispensed with.

IV. The exceptions to the above general rule are, 1st. Where the principal is so distant as to render the giving a reasonable notice to him impracticable. Great distance will excuse a departure from instructions, upon events not foreseen. (4 *Binney*, 361.) 2d. Where advances are made at the commencement of, and form part of, the original contract of factorage. The doctrine, in *Brown* v. *McGran*, (14 *Pet.* 495,) was not designed to overturn the general rule, that the factor, in advance, must notify the debtor, before he can sell to repay himself, against the instructions for the time being, of his principal, but was intended to be confined to the case of advances made under the original contract of factorage. It was so understood by Justice Story, who delivered the opinion. (*Story on Agency,* §§ 74, 371.) The court below erred in supposing there was no difference in this respect between advances made at the time of the engagement as factor, and advances subsequent thereto. It may reasonably be supposed, that in the former case, the engagement to accept and act as factor, upon the terms then prescribed, is the consideration upon which the advance is made; and therefore, a subsequent variance of the instructions would work an alteration of the agreement, forming the consideration of the advance. In the case of a *subsequent* advance, the original agreement, being a *past* transaction, is no part of the *consideration* thereof. (6 *Mee. & W.* 670.) In such case, there is no obligation to advance, as there is when the advance forms part of the original contract, and therefore no reciprocal obligation arises, to make the terms of sale, existing at the time of the subsequent advance, unalterable by the consignor.

V. If it be true, as the superior court supposed, that there was no just ground for distinguishing the case of Brown and McGran, from the general rule above stated, and making it an exception thereto, then the exception, and not the general rule, should give way.

VI. The court (assuming their view of the case of Brown and McGran to be correct) erred in supposing that a promise by the

consignee to the consignor, to hold on to the property, was void for want of consideration. 1st. The effect of such a promise was, to put the consignee off his guard, so as not to take measures to repay the advances and resume his discretion over the sale of his property. 2d. It was a waiver of his right to sell against instructions, and an acquiescence in them. Such a waiver requires no consideration, any more than a waiver of a right to receive specie instead of paper, or of the *time* of performance of a contract. (1 *Saund.* 320, 329.)

*F. B. Cutting & D. Lord,* for respondents. I. The property in question having been consigned to the defendants for sale, and the defendants having made advances on it to nearly the value of the property, without any limitation as to the time or terms of sale, they acquired a special property therein, and had a right to sell at their discretion honestly exercised with a view to the best interest of the consignor, at least so much of the consignment as would reimburse their advances. (2 *Kent's Com.* 642; *Story on Agency,* § 372, 374, *n.* 2d *ed.; Brown* v. *McGran,* 14 *Pet.* 479; *Pothonier* v. *Dawson, Holt's N. P. R.* 343.)

II. The right of a commission merchant to sell for a reimbursement of his advances is not at all derived from the common law doctrine of a pledge, nor is he restricted to a naked lien on the property. (1.) In the case of a pledge or mortgage, the repayment of the loan by the borrower is the primary intention of the parties—a sale of the property is contemplated only in case default is made in the stipulated payment. But on a consignment to a commission merchant, the sale of the property is the primary object. In the absence of instructions to the contrary, it is not merely the right but the duty of the consignee to sell at once. (*Evans* v. *Potter,* 2 *Gall.* 13.) (2.) If the consignor desires to anticipate the proceeds of the goods by obtaining an advance on them, the very terms imply that the property is to be sold to provide such repayment. It is not, as the plaintiff contends, a loan payable on demand; the consignor's individual liability does not arise till recourse has been had to the

Marfield *v.* Goodhue.

property. (*Corlies* v. *Cumming*, 6 *Cowen*, 184.) (3.) The right of selling is manifestly an important part of the security on which he relies for reimbursement, and this right can not be subsequently controlled or postponed by the consignor, against the will of the consignee, without destroying or impairing the security on which the advance was made. (2 *Kent's Com.* 644; *Story on Agency,* § 477; *Walsh* v. *Whitcomb*, 2 *Esp. N. P.* 565; *Hunt* v. *Rousmanier*, 8 *Wheat.* 174; *Gaussen* v. *Morton*, 10 *B. & C.* 731.)

III. No distinction can be drawn as to the rights of the parties, whether the advance is made at the time of the consignment, or after the goods are in the hands of the consignee; provided, when made, there are no instructions or agreement to hold the property subject to the control of the consignor. The object of the consignor in obtaining the advance is precisely the same in both cases, viz. to realize the value of the property before an opportunity for a sale occurs. The necessity of the consignee to reimburse himself from the sales of the property is the same in one case as in the other. In both cases it is equally a voluntary act of the consignee to make the advance; and equally in the power of the consignor when applying for it, to stipulate for time if he desires it. If any argument be drawn from the factor being placed in a position hostile to his principal, it applies with equal force, whether the advance is cotemporaneous with the consignment, or subsequent; or even where a limitation is agreed upon, after the expiration of such time. In both cases it is equally in the power of the consignor to reinstate himself in the absolute control of his property by refunding the amount advanced.

IV. All the cases relied on by the plaintiff are where the advance was made after instructions were given, or cotemporaneously; (*Bell* v. *Palmer*, 6 *Cowen*, 128; *Lafarge* v. *Kneeland*, 7 *id.* 456; *Blot* v. *Boiceau, Sandf. S. C. R.* 111; *Smart* v. *Sanders*, 10 *Lond. Jur. Oct.* 1846; *S. C.* 3 *Man. G. & S.* 380;) or else they are cases of naked liens, as *Dykers* v. *Allen*, (7 *Hill*, 497;) *Story on Bail.* § 308; *Bryce* v. *Brooks*, (26 *Wend.* 367;) *Zoit* v. *Millaudon*, (16 *Mart. Lou. R.* 470, &c.)

V. After the notice of the defendants in their letter of December 21st, that they should proceed to sell, it was incumbent on the plaintiff, if he wished to prevent the sale, to offer to reimburse the advances. The obligation of tendering the amount due was on the plaintiff, and the defendants were under no obligation to demand payment.

VI. In selling the 49 barrels of mess pork on the 12th of January, after the defendants had consented in their letter of the 9th to hold the remainder, they were influenced by a rise of $1 per barrel, which had taken place. But the letter of the 9th of January had not yet reached the plaintiff; nor was he in any way misled by it, or prevented tendering the balance due ; and if the letter was regarded in the light of a promise, it was void for want of a consideration.

CADY, J. Two questions are to be determined : 1st. Did the chief justice commit any error in the charge given to the jury ? 2d. Ought he to have given to the jury all or any of the instructions which he was requested to give by the plaintiff's counsel?

To determine whether the charge was such as the law required, the facts in the case must all be taken into consideration. These parties lived so near to each other, that letters could pass from one to the other in five or six days; and they could, without any inconvenient delay, consult each other and inform each other of their intentions, views and wishes. If the defendants had believed it necessary that they should sell the plaintiff's pork to secure the repayment of their advances, it would have been a very easy matter for them to have informed the plaintiff, that unless their advances were repaid, they should sell his pork to reimburse themselves. In two weeks from the time they had mailed such notice in New-York; the plaintiff might have been in that city and paid them, or sent them a draft on a responsible house or bank. But the law as given in charge to the jury would apply to all cases indiscriminately, whether the parties lived in the same house in the same city, or on opposite sides of the globe. According to the charge, the fact that the plain

Marfield *v.* Goodhue.

tiff had directed the defendants not to sell the pork, was wholly immaterial, because the defendants had a perfect right to disregard the directions. The jury were in effect told, that if a consignor has received any advances upon goods consigned, the factor has a perfect right to disregard any directions which the consignor may give in relation to the goods, and may rightfully sell without giving notice to his principal, or asking for a repayment of his advances, although he may give such notice without an hour's delay, and has good reason to believe that the consignor would repay the advances on an hour's notice. Can the interests of commerce require, that a factor should have such an unrestrained power over the goods of his principal? The charge given by the chief justice was reviewed and affirmed by the superior court, and that court were of opinion that the charge was fully warranted by the judgment of the supreme court of the United States in the case of *Brown & Co.* v. *Mc-Gran*, (14 *Peters*, 479.) The decisions of that court are entitled to great consideration; and in all cases which can be reviewed in that court, its judgments must be regarded as binding on all other judicial tribunals in our country; but in other cases the opinions of that court are entitled to the same respect, and no other, that is due to the opinions of any other court composed of judges of equal learning and ability.

There were facts in the case of *Brown & Co.* v. *McGran*, not to be found in this, which probably had an influence on the decision. The parties in that case lived in different countries, and they could not, in 1833, when the cause of action arose, have corresponded with each other in less than about seven or eight weeks. The consignor had become insolvent, and notice to him of an intended sale would have been useless. The factor could not delay a sale without taking on himself all the hazard of a fall in the market. It was insisted that the wish expressed by McGran to his factor, was not to be regarded as an order. In this case the superior court when speaking of the letters of the plaintiff to the defendants, say: " They contain a plain direction to withdraw the plaintiff's pork from the market;" and the parties lived so near each other, that letters passed from

one to the other in five or six days. There is no pretence that the plaintiff was insolvent and could not, if he had received notice of the defendants' intention to sell, have repaid their advances by the return mail. The defendants, therefore, could have incurred no hazard by ten or twelve days' delay. The facts in the two cases are so dissimilar, that in one the defendants might be entitled to judgment; while in the other the plaintiff would be, unless it be law in all cases between principal and factor, that if the factor has made any advances he can sell at his discretion, without notice to his principal, and without any demand of repayment, although the principal has ordered the factor not to sell. I have found no case other than that of *Brown & Co.* v. *McGran* in which the principle has been thus broadly stated and acted upon, nor do I believe that the rule adopted in that case ought to be regarded of such high authority as to be applied in all cases. The two cases to which Justice Story refers in support of the main point decided, are *Pothonier* v. *Dawson*, (1 *Holt's R.* 383,) and *Graham* v. *Dyster*, (6 *M. & Sel.* 1, 4, 5.) The former was a case of a pledge, and the question whether a pledgee was bound to give notice of a sale was not raised. The question was whether a pledgee could sell at all; not whether he was bound to give notice before he sold. The question in the latter case was whether a factor could pledge the goods of his principal; not whether he could sell them without notice, contrary to the orders of his principal.

Where goods are sent to a factor for sale, without any limitation or instructions as to the terms or time of sale, he is at liberty to sell as in the exercise of a sound discretion he shall deem proper for the interest of his principal. The factor in such a case is intrusted with the exercise of a discretion for the benefit of his principal and not for his own advantage, and that discretion the principal has a right to control. But after the factor has this authority, to be exercised *exclusively* for the benefit of his principal, he makes advances, and then his principal becomes satisfied that his interest will be promoted if the sale be delayed and he orders his factor not to sell. The chief justice instruct-

ed the jury that such an order was powerless, and in no respect limited the authority of the factor. Can this be so? The authority when given to the factor was given for the exclusive benefit of the principal. The interest of the factor was not to be regarded at all in the exercise of the authority. Then the factor makes an advance upon the credit of the goods, and of his principal; is he not, after that, as much bound as he was before, to have solely in view the interest of his principal when he sells, or is he at liberty, afterwards, to consult his own interest instead of that of this principal? After the advance, the principal has good reason to believe that a delay in selling will be advantageous to him, and he so informs his factor; is there any hardship in requiring of the factor, if he is unwilling to obey the order of his principal, to say to him—" as you have revoked my authority to sell at my discretion for your benefit, I shall sell at my discretion for my own benefit, unless you forthwith repay my advances."

When the principal has revoked the authority so far as it was to be exercised for him, he by no means impairs the power to sell which the factor has as a pledgee. A pledgee may sell on giving reasonable notice. (4 *Kent's Com.* 139, 140.)(*a*) If I employ a man to purchase goods for me, he is my factor; but if I revoke his authority, he ceases to be my factor. So, if being employed to sell goods for me, I order him not to sell, he ceases to be my factor; but if he has made advances upon the goods which I direct him to sell, he has the right of a pledgee to sell on giving me reasonable notice, and he is under no obligation after that to consult me as to the time and manner of sale. All he need do, is to act in good faith.

In the case of *Parker* v. *Brunker*, (22 *Pick.* 40,) the consignor had directed his goods not to be sold under a certain price. The factor made advances upon them, but could not sell the goods at the price limited, and therefore he could not sell without disobeying the orders of his principal; and the court held

---

(*a*) See *Wilson* v. *Little*, (*ante, vol.* 2, *p.* 443.)

that he had a right to sell, against the orders of his principal, to repay his advances after the consignor had refused upon application and after a reasonable time to repay advances. It may be said that in that case, the factor accepted the consignment knowing of the limitation as to the price at which the goods should be sold. How far that circumstance might have been urged as evidence of an implied agreement on his part, not to ask for a repayment of his advances until the goods could be sold for the price limited, it is not necessary now to inquire. In this case, the defendants made no advances when they received the pork except to pay the charges thereon. The implied contract on their part, was, that they would obey the plaintiff's directions as to the time and terms of sale of the pork. Such, too, was the implied contract on the part of the factor, in the case of *Parker* v. *Brunker ;* and it appears to me, that it is most reasonable that when a factor wishes to sell for his own benefit, and in violation of the orders of his principal, he should give notice of his intention to do so, unless his advances were repaid. There may be cases in which the factor might not be bound to give such notice ; but this is not such a case.

In the case of *Bell* v. *Palmer*, (6 *Cowen*, 128,) it was held that a factor, making advances on the goods of his principal even beyond their value, is bound to obey the instructions of the latter, as to the time of sale, and if being instructed to sell immediately, he refuse the first offer, in the expectation of a more favorable market, and afterwards sell at less than the first offer, he is liable, although he acted in perfect good faith. In that case the offer refused was not equal to the advances and expenses. Chief Justice Savage, in delivering the opinion of the court says: "It is the duty of the factor to manage the affairs of his principal in the same manner and with that care and diligence which a prudent and discreet merchant would exercise in relation to his own affairs, but he still must obey his instructions, because it is the principal who bears the loss." He also says, " the plaintiffs having advanced money on the goods gave them a lien for the amount of their advance ; but I do not find any authority for saying that the lien thus created alters the

rights of the parties in any respect, so far as relates to the duty of the factor in making sale of the goods. Nor is there any rea-son why it should. The principals are liable for the money advanced; and the goods being at their risk are subject to their order and control in every respect not inconsistent with the lien of the factor."

In the case cited, the factor was held liable for not selling as soon as he was directed to sell. In the case before the court, it is sought to make the defendants liable because they sold when they were ordered not to sell. In both cases, the factor disre-garded the orders of his principal, and the principal thereby sus-tained a great loss. As a general rule the principal has a right to revoke the authority which the law implies from the fact that the goods were delivered to the factor for sale; but that revo-cation will leave untouched the authority to sell which the fac-tor, if he has made advances, has to sell as pledgee; and the plaintiff in this case, although he had received advances, had a right by subsequent instructions so far to control the sale that the defendants could not legally sell without giving notice to the plaintiff of their intentions; and in this respect, I think the jury were misdirected. Whenever a person's property is to be sold against his wishes, justice demands that he should have notice *why* it is to be sold, especially when such notice can con-viently be given. If the defendants could have shown, that by delaying the sale, they would have been exposed to a loss, they might probably have excused their disobedience to the orders of their principal. They were not only instructed by him to take his pork out of the market, but promised to do so. And do the interests of commerce require, that factors and commission mer-chants should be allowed to make promises and violate them, without incurring any responsibility, although their principals may suffer great loss thereby? What is the excuse made by the defendants, for not performing their promise? It is said that it was a promise without consideration; and the superior court held that that was a sufficient and legal excuse. That same excuse was urged in the case of *Brown & Co.* v. *McGran ;* but Justice Story, in giving the opinion of the court, took no

notice of it; he neither sanctioned nor rejected it. A consideration from which the law will imply a promise, must be sufficient to uphold an express promise. What promise did the law imply when the plaintiff delivered his pork to the defendants? The law implied a promise on the part of the plaintiff, that the defendants should be paid a reasonable compensation for the care they should bestow in relation to the pork; and the defendants' account shows that they were to have interest on their advances and two and a half per cent on the amount of their sales; and the law implied a promise on their part, that they would take care of the plaintiff's pork, and in the absence of any instructions from him, as to the time and terms of the sale, they would seek his interest exclusively in the sale thereof, and would obey such instructions as he should give. It is not questioned, but there was a sufficient consideration to uphold this agreement between the parties, whether it be regarded as an implied or express agreement. The law however, does not imply an agreement without a consideration. After the pork was delivered to the defendants, and the parties had made an agreement as above stated, the defendants made large advances for and on account of the plaintiff, and after such advances, the plaintiff directed the defendants to take his pork out of the market, or in other words, directed them not to sell it; and they promised to obey that order; but they immediately sold it in violation of that promise; and the chief justice, on the trial, and the superior court on reviewing his opinion, held, that the promise required a new consideration, and was void, because no such consideration was shown. But it is certainly very important to ascertain whether it was a promise which required a new consideration. It was a mere reiteration of the implied or express promise which the defendants made when they received the pork, that they would obey the plaintiff's instructions as to the sale of it; and the original consideration would uphold the second as well as the first promise, unless the evidence in the cause was such as clearly proved that the defendants had been discharged from the performance of their first promise. What better evidence could be given, that nothing which had been

Marfield *v.* Goodhue.

done between the parties, had, in their opinion, discharged the defendants from their promise to obey the plaintiff's instructions, than that the plaintiff gave instructions, and the defendants promised to obey? When the plaintiff gave directions to the defendants to take their pork out of the market, the defendants must have understood him as claiming the right to give such instructions, and by promising to obey, they admitted such right; they admitted that nothing had occurred between them which had weakened their original promise to obey his instructions. Suppose the defendants, when the plaintiff instructed them not to sell, had answered, "you have a right to give instructions," would it have been any better evidence of such right than their promise to obey?

When the plaintiff directed the defendants to take his pork out of the market, if they did not intend to admit his right to give and their obligation to obey, what did good faith require of them? They ought promptly to have put him on his guard, by replying to his order, that he, by accepting advances, had discharged them from all obligations to obey his instructions, and that they claimed and intended to exert the right to sell *when they pleased* unless their advances were repaid. Why did the defendants withhold this reply, and instead of it promise to obey the order? Will the law allow the defendants to answer that inquiry by saying, " we gave the promise in order to mislead the plaintiff; we wanted to secure to ourselves a commission of two and a half per cent on the sale of the pork, and we anticipated, that if we informed him that we would not obey his instructions and would sell at our pleasure, unless our advances were repaid, he would have repaid our advances, taken his pork out of our hands, and we would not in that case have received a commission on the amount of sales ?" If the defendants made the promise to take the pork out of market with a view to secure a commission of two and a half per cent on the amount of the sales, that might be regarded as a sufficient consideration for the promise, if any new consideration was necessary. It can hardly be necessary to say that the jury ought, in my opinion, to have been instructed that the defendants were at all

events liable for the damages which the plaintiff sustained by the defendants' sale of the pork, " after their agreement to hold on to it for the present." For this reason as well as the misdirection before noticed, the judgment of the superior court ought to be reversed, and a new trial ought to be granted.

Ordered accordingly.